IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Kimbrell Lamark Dandy, | ) | |
| | ) | Civil Action No. 6:17-331-BHH-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1] The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## I.  ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on October 23, 2009, alleging that he became unable to work on October 1, 2009.  The application was denied initially and on reconsideration by the Social Security Administration. On February 18, 2011, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and Karl S. Weldon, an impartial vocational expert, appeared via video at a hearing held in Chattanooga, Tennessee, on December 1, 2011, considered the case *de novo* and, on February 24, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  On March 28, 2013,

---

[1]  A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

the Appeals Council denied the plaintiff's request for review, making the ALJ's finding the final decision of the Commissioner of Social Security. On April 23, 2013, the plaintiff filed an action in this court for judicial review, and on September 25, 2014, the case was remanded by the Honorable R. Bryan Harwell, United States District Judge, for a more thorough explanation of the weight given to the plaintiff's treating physician's opinion (Tr. 771-827). Upon remand from the Appeals Council, hearings were held before the ALJ on April 7 and November 6, 2015. The plaintiff and Robert Brabham, Jr., an impartial vocational expert, appeared and testified at the April 2015 hearing. Henry Maimon, M.D., and Arthur Brovender, M.D., impartial medical experts, appeared and testified at the November 2015 hearing. Another impartial vocational expert, Benson Hecker, Ph.D., testified at the second hearing. On December 9, 2015, the ALJ again found the plaintiff not disabled (Tr. 611-44). On December 19, 2016, the Appeals Council found no reason to assume jurisdiction, making the ALJ's finding the final decision of the Commissioner of Social Security (Tr. 599-607). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1) The claimant last met the insured status requirements of the Social Security Act through December 31, 2013.

(2) The claimant did not engage in substantial gainful activity during the period from his alleged onset date of October 1, 2009, through his date last insured of December 31, 2013 (20 C.F.R. § 404.1571 *et seq*).

(3) Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the cervical and lumbar spines, degenerative joint disease of right shoulder and knees, obesity, chronic pain syndrome, mood disorder, and anxiety-related disorder (20 C.F.R. § 404.1520(c)).

(4) Through the date last insured, the claimant does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments

2

in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)  After careful consideration of the entire record, I find that through the date last insured, the claimant had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except that he was capable of lifting up to 15 pounds occasionally and could stand or walk for up to two hours in an eight-hour workday and sit for up to six hours in an eight-hour workday with normal breaks, but could exercise a sit/stand option. He could not be off task for more than 5% of the work period or more than three minutes in an hour. He could not be away from the workstation and could still attend to work tasks. He could sit at any one time for up to 45 minutes and stand and/or walk at any one time for up to 30 minute segments. He could occasionally use the right upper extremity for pushing or pulling and frequently use the left upper extremity for pushing or pulling. He could occasionally use the right lower extremity for operation of foot controls and frequently use the left lower extremity for operation of foot controls. He could not climb ladders/ropes/scaffolds and could occasionally climb ramps or stairs with no more than four steps at one time with the assistance of a single handrail. He could balance frequently, could occasionally stoop, and could not crouch, kneel or crawl. He was limited to frequent overhead reaching with the left upper extremity and occasional overhead reaching with the right upper extremity. He had to avoid concentrated exposure to extreme cold, excessive vibration, and exposure to fumes, odors, dust, gases, chemicals, poorly ventilated areas, and hazards such as unprotected heights and use of moving machinery. He was limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements with simple work-related decisions and few if any changes in the workplace and if so, they should be introduced gradually.

(6)  Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)  The claimant was born on March 3, 1971, and was 42 years old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. § 404.1563).

(8)  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the

3

claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Through the date last insured, considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11) The claimant was not under a disability, as defined in the Social Security Act, at any time from October 1, 2009, the alleged onset date, through December 31, 2013, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## II. APPLICABLE LAW

Under 42 U.S.C. § 423(d)(1)(A), (d)(5), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that meets or medically equals an impairment contained in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, (4) can perform his past relevant work, and (5) can perform other work. *Id.* § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

4

A claimant must make a *prima facie* case of disability by showing he is unable to return to his past relevant work because of his impairments. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Once an individual has established a *prima facie* case of disability, the burden shifts to the Commissioner to establish that the plaintiff can perform alternative work and that such work exists in the national economy. *Id.* (citing 42 U.S.C. § 423(d)(2)(A)). The Commissioner may carry this burden by obtaining testimony from a vocational expert. *Id.* at 192.

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* Consequently, even if the court disagrees with Commissioner's decision, the court must uphold it if it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### III. EVIDENCE PRESENTED

The plaintiff was 38 years old on his alleged disability onset date (October 1, 2009) and 42 years old on his date last insured (December 31, 2013). He has a GED and past relevant work as a material handler, forklift operator, assembler, and wire harness assembler (Tr. 642-43, 1311).

Between February 2009 and May 2009, the plaintiff received chiropractic treatment for low back pain following a motor vehicle accident (Tr. 216-19).

On February 3, 2009, the plaintiff received treatment at Orthopaedic Associates from David Mitchell, M.D. Dr. Mitchell ordered a course of physical therapy (Tr. 220, 250–52).

On April 28, 2009, the plaintiff underwent an MRI of his lumbar spine, which showed "[m]ild degenerative disc changes only at L1-L2"; [g]eneralized mild posterior facet arthrosis changes . . . best evident at L4-L5 and L5-S1"; and "mildly prominent" epidural lipomatosis. According to progress notes from the plaintiff's orthopedist, the MRI showed "nothing significant" beyond the lipomatosis, which prompted a referral to a neurosurgeon for further evaluation (Tr. 244, 246, 248-49).

On May 26, 2009, the plaintiff reported to neurosurgeon Cavert McCorkle, M.D., that he was experiencing persistent and, at times, severe pain radiating from his lumbar spine into both hips and legs. Upon physical examination, the plaintiff was able to stand independently; had normal station and a deliberate but not overly antalgic gait; could walk on his heels and toes, but reported increasing low back pain; was mildly tender to deep palpation in the lower lumbar paraspinous muscles; did not have overt muscle spasms; had some difficulty with forward and lateral flexion in the lower back; reported minimal pain upon straight leg raising; reported primarily hip pain during a FABERE maneuver (a test for sacroiliac disease); showed no signs of atrophy or overt weakness in the lower extremities; and showed no instability in his spine or extremities. The plaintiff's sensation and proprioception were grossly intact; his deep-tendon reflexes were 2+ and symmetrical, and there were no long-tract signs. Dr. McCorkle independently reviewed the results of the plaintiff's April 2009 MRI and did "not note any evidence of any significant structural abnormalities in his lumbar spine that would explain the level of his discomfort or warrant surgical intervention." He determined that the plaintiff was not a surgical candidate and recommended conservative treatment. Dr. McCorkle opined that the plaintiff's discomfort

would improve with time.  Three weeks later, the plaintiff was discharged from physical therapy after reporting that he had not experienced any improvement (Tr. 220-22, 229).

On May 27, 2009, the plaintiff saw neurologist Carol Kooistra, M.D.  On physical examination, she noted muscle guarding in the low back area and limitation of hip range of motion bilaterally.  She diagnosed musculoskeletal pain syndrome, possible degenerative disc disease, and prescribed Neurontin. Dr. Kooistra noted that the plaintiff appeared neurologically intact, but demonstrated positive straight leg raising and restricted range of motion with pain behavior in both hips.  An EMG showed right L5 radiculopathy. Meanwhile, a repeat MRI of the plaintiff's lumbar spine "failed to demonstrate any lesion to account for his EMG findings" (Tr. 302, 308-12)

On May 29, 2009, Dr. Mitchell noted that the plaintiff's neurologic assessment with Dr. McCorkle had been unremarkable and ordered an EMG nerve conduction study on both lower extremities and a bone scan.  Whole body bone imaging showed degenerative changes in the right shoulder and right knee, but otherwise showed "[n]o significant abnormality to correlate with [the plaintiff's] lateral hip and leg pain" (Tr. 240-42).

On June 2, 2009, during a followup with Dr. Kooistra, the plaintiff demonstrated negative straight leg raising, and his muscle tone, bulk, strength, and reflexes all appeared normal (Tr. 299). During a physical examination one month later, the plaintiff appeared anxious and reported 10/10 pain during a physical examination; however, objective clinical findings showed no abnormalities.  Dr. Kooistra ordered a lumbar myelogram and CT scan, which did not show any significant changes from prior studies. A nerve study showed right L5 radiculopathy (Tr. 292-93, 297-98, 302).  The plaintiff followed up with Dr. Kooistra on June 24, 2009, and she suggested aquatic therapy.  She also prescribed nortriptyline, mobic, and Lortab 10 mg (Tr. 299).  During a followup visit with Dr. Kooistra on July 30, 2009, the plaintiff reported that aquatic therapy had not helped him and had made his back pain worse.  Dr. Kooistra noted that the plaintiff appeared anxious

7

and noted "[p]robable musculoskeletal low back pain, although there is evidence of abnormality on EMG in the right lower extremity in the biceps muscle. He has not responded to any treatment at this point" (Tr. 298). Dr. Kooistra saw the plaintiff again on August 28, 2009, for reported severe back pain. He had no neurological deficits (Tr. 297).

On September 24, 2009, the plaintiff was admitted to Spartanburg Regional with a myocardial infarction. He was found to have significant stenosis in the mid right coronary artery, and two stents were placed. He was discharged from the hospital on September 27, 2009 (Tr. 253–54).

On October 13, 2009, the plaintiff presented to Bert Blackwell, M.D., a pain management specialist, upon referral from Dr. Kooistra. He complained of headaches, shortness of breath, chest pain, awakening at night, constipation, low-back pain, joint pain, arthritis, weakness, trouble sleeping, anxiety, and fatigue. He reported that his pain was radiating down his bilateral lower extremities into his feet. Upon physical examination, he showed diminished patellar and right Achilles reflexes, a positive response to lumbar facet provocation maneuvers on the left, and pain with exaggerated lumbar flexion. At the same time, the plaintiff appeared oriented; his mood and affect were appropriate; he displayed no pain behaviors; his sensation was intact; he showed no tenderness or crepitation in either lower extremity; his strength in both lower extremities was 5/5, with normal muscle tone and bulk; he demonstrated negative straight leg raising bilaterally; and he showed no tenderness to palpation throughout the lumbar spine. Dr. Blackwell diagnosed the plaintiff with lumbar radiculopathy, lumbar disc displacement/neuritis/algia, insomnia, and lumbar arthritis/spondylosis. He noted that objective studies had "failed to demonstrate pathology," but that there was "clinical and electrodiagnostic evidence of root irritation." Dr. Blackwell recommended epidural steroid injections (Tr. 336-38).

The plaintiff followed up with Alejandro N. Lopez, M.D., at Cardiology Consultants on October 26, 2009. He reported that he was still experiencing chest

pressure, pain, and shortness of breath. Prior to the plaintiff's heart attack, he had been on a prednisone trial, which was ineffective for his pain, and his neurologist had referred him to pain management. Following his heart attack, the plaintiff was placed on aspirin and Plavix, which eliminated his ability to undergo injection techniques for his pain (Tr. 296, 315).

On November 9, 2009, Dr. Blackwell noted that the plaintiff's urine drug screen tested negative for opiates, which he was supposed to be taking for pain management (Tr. 340).

On December 8, 2009, the plaintiff reported increased pain that caused poor sleeping patterns, and he requested something stronger than Oxycodone. He was prescribed MS Contin 15 mg (Tr. 342-43).

The plaintiff returned to Dr. Kooistra on January 28, 2010, for difficulties with his chronic low back pain. Dr. Kooistra noted that his treatment options had been limited due to the antiplatelet therapy required by his cardiac stenting, and she prescribed Flexeril but deferred all other medication renewals to Dr. Blackwell (Tr. 379–80).

During an examination on February 5, 2010, the plaintiff's posture and gait were normal, and he denied feeling depressed (Tr. 344-45).

On February 12, 2010, state agency physician Seham El-Ibiary, M.D., reviewed the plaintiff's medical records and opined that he could meet the exertional requirements of light work. Dr. El-Ibiary also opined that the plaintiff could frequently climb ramps and stairs, kneel, crouch, crawl, and reach overhead; could occasionally climb ladders, ropes, and scaffolds, balance, and stoop; and should avoid concentrated exposure to workplace hazards such as machinery or heights. He noted that the plaintiff's alleged symptoms and limitations were only partially credible in light of the objective medical evidence, which showed only mild degenerative disc disease (Tr. 364-68).

Also on February 12, 2010, state agency psychologist Xanthia Harkness, Ph.D., reviewed the plaintiff's medical records and determined that he did not have a severe mental impairment, notwithstanding his reported anxiety. Dr. Harkness indicated mild limitations with respect to the plaintiff's activities of daily living; no limitations with respect to his abilities to maintain social functioning and concentration, persistence, or pace; and no episodes of decompensation. She concluded that the plaintiff's mental limitations did not meet the criteria for Listing 12.06 (anxiety-related disorders) (Tr. 349-62).

On February 16, 2010, the plaintiff reported to Dr. Blackwell that he was having problems with side effects from his medications. He also reported continued low back pain and stated that he was having difficulty sleeping at night (Tr. 518).

The plaintiff returned to Dr. Lopez at Cardiology Consultants for evaluation of his left side chest pain on March 2, 2010. The plaintiff reported a significant amount of chest pain and shortness of breath when he tried to lie on his left side and with walking. Dr. Lopez suspected that the plaintiff's chest pain was related to heightened anxiety rather than cardiac issues (Tr. 398–401).

On March 16, 2010, the plaintiff saw Dr. Blackwell for medication renewals. He reported that his medications were helping, though he still had trouble sleeping. The Zanaflex was making him very tired. Dr. Blackwell decided that the plaintiff should continue with his medications and return for a followup visit in two months (Tr. 402-04).

During an examination on April 28, 2010, with Dr. Kooistra, the plaintiff showed normal muscle tone, bulk, and strength; normal fine motor movements and foot-tapping; normal and symmetric reflexes; normal gait; and negative straight leg raising. Dr. Kooistra noted that epidural steroid injections had been ineffective (Tr. 377).

On May 10, 2010, Dr. Kooistra completed an insurance questionnaire, in which she opined that the plaintiff was totally disabled from any occupation. She opined that he could continuously stand for one hour, sit for two hours, and drive or walk between

10

zero and one hour.  Dr. Kooistra indicated no cardiac limitations and no limitations with respect to the plaintiff's ability to use his hands for repetitive movement and to reach above shoulder level bilaterally.  She also indicated that she did not expect the plaintiff's disability prognosis to change (Tr. 374-75).

On May 11, 2010, the plaintiff returned to Dr. Blackwell and reported that the medications were helping, but he was taking more than prescribed due to increased pain. He continued to have trouble sleeping (Tr. 405–07).

On August 10, 2010, the plaintiff told Lesle Long, M.D., of Pain Management Associates that his pain rated 5/10 with medications and 10/10 without.  He complained of continued chest pain and pressure and "a lot of back pain . . . running down his left leg causing numbness and some tingling."  On August 25, 2010, the plaintiff's physical examination results remained unchanged, but he continued to complain of low back pain and intermittent pressure in his chest (Tr. 382, 408).

On September 10, 2010, the plaintiff downgraded his reported pain level with medications to 3/10.  He complained again of chest pain and pressure and pain running down his left leg causing numbness and tingling (Tr. 411).

On September 22, 2010, the plaintiff saw Dr. Lopez again for evaluation of his chest pain and left arm pain.  Because testing essentially was normal, Dr. Lopez determined that the chest pain likely was a component of anxiety or possibly cervical radiculopathy (Tr. 385–87).

On October 12 and 26, 2010, the plaintiff had an epidural steroid injection for lumbar radiculopathy (Tr. 417, 528).

On November 9, 2010, he reported to Dr. Blackwell that a recent epidural steroid injection had been ineffective, stating that his present pain level rated 10/10 and that his medication was causing headaches.  The  plaintiff also reported that his back pain had spread to his neck and that "anxiety is a significant part of his pain" (Tr. 419-21).

11

The plaintiff was in another car accident on December 2, 2010, and was taken to the emergency room at Mary Black Hospital complaining of lower back pain. He reported that the pain was chronic and that it had "flared up" from the collision. He was discharged with instructions to follow up with his primary care doctor (Tr. 470–75).

On December 13, 2010, the plaintiff saw James P. Behr, M.D., of Orthopaedic Associates. The plaintiff complained of fatigue, blurring vision, shortness of breath, chest pain, constipation, vomiting, incontinence, back and joint pain, numbness and tingling in his arms and legs, difficulty sleeping, anxiety, and depression. He reported "bandlike" pain across the low back with radiation and that the pain was better with medications and TENS unit. The pain was worse with standing and lying down. On examination, the plaintiff appeared healthy, alert and oriented, and in no acute distress. His gait was normal, sensation was grossly intact, and deep tendon reflexes were equal and symmetric. He had positive facet loading right greater than left, and straight leg raise was negative. Dr. Behr assessed that the plaintiff's pain complaints were likely related to myofascial pain with a component of facet arthropathy on the right greater than the left at L3-4, L4-5, L5-S1. Dr. Behr recommended a right L2-5 medial branch block (Tr. 429-37).

The plaintiff returned to Dr. Behr on January 6, 2011. He reported that he had "excellent relief" from the block, but the relief only lasted for about three to six hours before the pain returned. Dr. Behr noted that the plaintiff had undergone epidural steroid injections twice in the past with no relief, and his feeling that most of the plaintiff's pain "is likely right sided facet arthropathy." Dr. Behr suggested radiofrequency ablation and possibly a discogram if the ablation was not successful in providing pain relief. The ablation was performed on January 12, 2011 (Tr. 426-28, 479-80).

On January 28, 2011, Dr. Behr recorded essentially normal physical examination results, but noted "[f]acet loading positive on the right greater than the left." He hypothesized that the plaintiff's pain was caused by right-sided facet arthopathy and noted

that the plaintiff had obtained 70% relief following a medial branch block procedure (Tr. 427-28).

On February 3, 2011, the plaintiff reported that the ablation had not helped his pain at all. He continued to report low back pain radiating down the buttocks bilaterally to the lateral thighs. He reported that Oxycodone was the only medication that gave him any pain relief and that he was having to take up to six to seven per day (Tr. 485).

On February 4, 2011, a second state agency psychologist, Craig Horn, Ph.D., reviewed an updated record and agreed with Dr. Harkness' assessment of February 2010, finding that the plaintiff did not have a severe mental impairment. Dr. Horn concluded that the plaintiff had no limitations with respect to his activities of daily living and ability to maintain social functioning; mild difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 438-51).

On February 17, 2011, upon review of an expanded record, state agency physician Dale Van Slooten, M.D., assessed the same exertional limitations as Dr. El-Ibiary had in February 2010. Dr. Van Slooten assessed milder nonexertional limitations, opining that the plaintiff could balance and stoop frequently, rather than occasionally, but he otherwise agreed with the earlier assessment (Tr. 453-59).

On March 4, 2011, the plaintiff had a discogram at L3-4, L4-5, and L5 S1, but none of the discs were considered likely to be the cause of his pain, and the discogram was considered to be nondiagnostic.(Tr. 476-78). In a March 18, 2011, progress note, Dr. Behr stated: "Unfortunately [the plaintiff] has been taking more medication than was prescribed and has been calling multiple times for early refills. Unfortunately due to a combination of this behavior as well as the fact that there is no clearly identifiable etiology[,] I do not feel comfortable prescribing any further opioid medications for this patient." Dr. Behr referred the plaintiff for drug counseling and instructed him to follow up with him only as needed.

13

Meanwhile, the plaintiff's primary care physician continued to prescribe medications for pain and anxiety, including oxycodone (Tr. 484, 489-90).

On March 18, 2011, the plaintiff presented to his family doctor's office regarding his back pain. Examination showed decreased flexion and extension of the spine as well as paraspinal muscle tenderness. Steven P. Hess, M.D., agreed to take over the writing of the plaintiff's pain medicine and prescribed Oxycondone, Cymbalta, and Duragesic patches. (Tr. 493-94).

On March 25, 2011, the plaintiff returned to Dr. Kooistra after Dr. Behr dismissed him as a patient. The plaintiff reported that constant pain restricted his performance of household activities, but that he drove his child to school and managed his hygiene. He reported some benefit with the addition of Duragesic to his list of medications. Dr. Kooistra noted that Dr. Bailes now was prescribing medication. She opined that the plaintiff had attained "MMI [maximum medical improvement] and appears permanently and totally disabled" (Tr. 460).

On March 31, 2011, Dr. Kooistra completed a continuing disability claim form, in which she opined that the plaintiff had been completely disabled since May 2009. She also opined that his prognosis was "fair," that he would be able to resume work-related activities in "over 24 months," and that he was a candidate for rehabilitation (Tr. 462).

On a supplemental questionnaire dated April 12, 2011, Dr. Kooistra opined that the plaintiff could not perform even sedentary work and expressed doubt that he would return to work. She indicated that the plaintiff's disability was substantiated by "[s]ubjective findings only" (Tr. 463).

On April 20, 2011, the plaintiff reported to the Spartanburg Regional emergency room complaining that he aggravated his low-back pain during another motor vehicle accident the night before (Tr. 506-11). The plaintiff returned to the emergency room on May 11, 2011, complaining of chest pain, pressure, headache, and anxiety (Tr. 546-53).

On June 10, 2011, Marco Rodriguez, M.D., at Orthopedic Specialties of Spartanburg performed a consultative orthopedic examination. The plaintiff reported continued pain in the low back and legs as well as increasing neck pain for the last four months. On physical examination, the plaintiff had pain with internal rotation of the hip on the left as well as with extension and extension rotation. Neck pain was worse with flexion forward. Dr. Rodriguez noted the plaintiff's generally benign laboratory and clinical findings. He stated that the plaintiff had exhausted all conservative treatment options and referred him for a spinal cord stimulator trial (Tr. 512-13).

On July 18, 2011, the plaintiff was evaluated by C. David Tollison, Ph.D., a licensed clinical psychologist at Carolinas Center for Advanced Management of Pain. Dr. Tollison diagnosed the plaintiff with generalized anxiety disorder and psychological factors affecting physical condition and noted that associated with the plaintiff's anxiety are "feelings of agitation, dissatisfaction, restlessness, worry, nervousness, rumination, apprehension, insecurity, and generalized fear." Dr. Tollison also expressed the following opinion regarding the plaintiff's ability to function in a work environment:

> Based upon my evaluation of the patient, review of medical records, and results of psychological testing, it is my opinion Mr. Dandy does not exhibit the concentration, persistence, or pace typically required in a work setting. His concentration is impaired by his constant monitoring of his pain and cardiac functioning. His persistence and pace are impaired by his chronic fatigue coupled with his fear of exertion. It is unlikely he could complete a series of workdays without interruption from his psychological symptoms. He is expected to have difficulty completing tasks in a timely manner. He is also expected to have problems with his requirement of frequent and unscheduled rest periods. The totality of the medical record, as well as my evaluation, indicates a poor tolerance for stress. Work pressures, stresses, and demand situations are expected to result in deterioration both in physical and psychological functioning. His condition is chronic and expected to continue over the next twelve or more months.

15

Dr. Tollison opined that "psychological factors are influential in exacerbating both [the plaintiff's] pain as well as his cardiac symptoms" (Tr. 465-68).

On July 19, 2011, the plaintiff was seen by Dr. Blackwell at Pain Management Associates and discussed a spinal cord stimulator. Dr. Blackwell noted that the plaintiff's urine drug screen results were "questionable" and would be sent for further analysis. Dr. Blackwell referred the plaintiff to Leslie D. Long, M.D., and Tamara Finney, LISW-CP, for a psychiatric evaluation to determine whether a spinal cord stimulator was appropriate. On July 26, 2011, the plaintiff saw Dr. Long. The plaintiff's Beck Depression Inventory ("BDI") score of 21 indicated moderate depression, and he appeared impulsive; however, he also appeared to be fully oriented and in no acute distress; behaved appropriately; displayed non-pressured speech without deficit; showed reality-based perception, logical thought processes, and thought content with full range of ability, no paucity of thought, and no flight of ideas; was able to concentrate appropriately; could remember two out of three objects after five minutes; showed appropriate insight, judgment, and rationality; and denied suicidal thoughts or attempts. The plaintiff scored 27/30 on a Mini-Mental Status Exam, indicating only mild cognitive impairments. Dr. Long stated that the plaintiff would be a good candidate for a spinal cord stimulator (Tr. 516, 523-25).

On August 8, 2011, a trial spinal cord stimulator was successfully implanted. The plaintiff told Dr. Kooistra that the stimulator reduced his pain by half. Michael N. Bucci, M.D., a neurosurgeon, noted that the spinal cord stimulator trial had been "highly beneficial" (Tr. 526-27, 531, 561).

On August 5, 2011, the plaintiff's primary care physician, George Bailes, M.D., "strongly discourage[d] him from allowing himself to go on disability or to resort to strong narcotics" (Tr. 556-57).

On September 12, 2011, Dr. Bucci successfully implanted a permanent spinal cord stimulator. When the plaintiff returned to Dr. Blackwell for a followup on September

16

26, 2011, he reported that he was doing well with the spinal cord stimulator  (Tr. 531-32, 566).

In October and November 2011, Dr. Bailes stated that the "[anxiety] problem is presently controlled" (Tr. 555, 596).

On November 16, 2011, Dr. Kooistra prepared an attending physician statement in which she opined that the plaintiff had constant, severe low back pain and noted objective findings of reduced range of motion, tenderness, muscle spasm, and impaired sleep.  She opined that the plaintiff could sit for one hour at a time and four hours total in an eight-hour workday; stand for 30 minutes at a time and stand/walk for less than two hours in an eight-hour workday; rarely lift/carry up to ten pounds; never lift/carry more than ten pounds; rarely twist, stoop, and climb stairs; and never squat or climb ladders.  The plaintiff could reach, handle, and finger objects without limitation.  Dr. Kooistra opined that the plaintiff could not tolerate even sedentary work and that he had been so disabled since October 2009 (Tr. 578-80).

On November 28, 2011, the plaintiff saw Dr. Bailes, his primary care provider, complaining of daily headaches with pain behind his eyes (Tr. 595).

At his December 1, 2011, hearing, the plaintiff testified:  "My biggest problem right now is that I deal with a lot of lower back pain that runs down my right and left leg. With that said, it prohibits me from being able to perform a lot of duties that I used to perform on a daily basis for a certain amount of time.  I'm also dealing with chest pain, which is determined from my doctors that it's a lot of anxiety . . . I take medication for that daily. . . . This anxiety is triggered by my back pain when I'm overexerted . . . [I]t puts me in a position where I have to lay down or have to get somewhere to sit down and relax."  The plaintiff testified that his back pain was located at "like the L5, the lower part of my back." He described it as a "very intense," "stabbing," "tingling" pain, sometimes accompanied by a burning sensation.  He testified that nerve blocking procedures did not provide any relief,

17

but that the spinal cord stimulator allowed him to stand and sit a little longer than before, "where [he had] to stand up every five to ten minutes" The plaintiff stated that, with the spinal cord stimulator, he was able to sit at least 30 or 40 minutes at a time, depending on how soft and comfortable the seat was. Previously, he had been able to sit for five to 15 minutes at most. He testified that he could stand for 30 or 40 minutes at a time, whereas he had previously been able to stand for only 20 to 30 minutes at a time. His pain medications also helped. When asked to explain Dr. Behr's notation that the plaintiff had been overusing his medications, the plaintiff said that he had experienced increased pain after several procedures involving long needles, which prompted him to take "one to maybe two pain meds extra more a day than required[,] which led to [him] running out two to three days prior until it was time for [his] next refill." He testified that Dr. Blackwell and his primary care physician continued to prescribe pain medications, including Tramadol and oxycodone (Tr. 80-84).

The plaintiff further testified that he also used a back brace when he tried to do minor things around the home. He reported difficulty sleeping and stated that he tried to avoid a lot of standing or bending. He said he could drive "[j]ust a little," because he could not use his spinal cord stimulator or take pain medications while driving. The plaintiff testified that his medications caused dizziness, lightheadedness, and nausea. He testified that his anxiety medication helped his chest pain "[a] whole lot," but that he continued to experience chest pressure in certain situations, such as when he took extended trips to the mall with his wife. He testified that he previously owned a mobile car wash business, but stopped working because of his impairments. His typical "good" day involved making his bed, loading the dishwasher, taking a break, and running small errands. He was also able to do "light duty yard work," such as using a blower on his driveway (Tr. 85-90). The plaintiff testified that he could not do a sedentary job that would enable him to sit and stand at will due to pain. After the vocational expert testified, the plaintiff was given an opportunity to

supplement his testimony and added that "[his] balance is very off" and that he was "stumbling all the time around the house" and had to lean on the wall for support (Tr. 90-91, 105-06).

On December 12, 2011, the plaintiff saw Dr. Kooistra for a followup. The plaintiff reported that his standing and sitting tolerances had increased since receiving the spinal cord stimulator, but his activities had not significantly increased. He continued to require a day of bedrest if he "does too much." Additionally, the plaintiff stated that he continued to experience "significant" low back pain at night and continued to experience anxiety in connection with his increased low back pain. Dr. Kooistra noted, "I believe the patient has reached maximum medical improvement and will need continued monitoring indefinitely through Dr. Blackwell" (Tr. 1131).

The plaintiff presented to Spartanburg Regional Emergency Room again on December 16, 2011, complaining of chest pain. He reported that his pain "comes and goes," but his chest pressure is constant and he reported difficulty breathing (Tr. 1018-25). The plaintiff had a cardiac catheterization on December 19, 2011, but it did not reveal any additional coronary disease (Tr. 1051). On December 21, 2011, the plaintiff returned to Dr. Bailes for a recheck of his anxiety and panic attacks. He reported that his symptoms were exacerbated by stress (Tr. 981).

Also on December 21, 2011, Dr. Kooistra prepared another attending physician statement. She opined that the plaintiff could sit for one hour at a time and two hours total in an eight-hour workday; stand for 30 minutes at a time and stand/walk for less than two hours in an eight-hour workday; and walk for 45 minutes. In response to an inquiry regarding the basis of her May 2010 and April 2011 opinions, Dr. Kooistra stated that her opinions were based on "history diagnostic exam studies" (Tr. 597-98).

On January 6, 2012, the plaintiff returned to Pain Management Associates with continued low back pain. He described his pain as "dull, sharp, stabbing, burning,

19

shooting, tingling, and aching." On examination he had altered reflexes of 1+ patellar bilaterally and 1+ Achilles bilaterally (Tr. 1278-81). The plaintiff saw Ronald H. Littlefield, M.D., on February 25, 2012, for palpitations. Dr. Littlefield's record notes that "[t]he episodes sometimes will feel as though the heart flips but usually is not associated with any major symptoms but do seem to be getting more frequent" and that the "[p]alpitations are concerning" (Tr. 1129-30). On March 27, 2012, the plaintiff saw Dr. Lopez. He continued to complain of chest tightness on a daily basis, as well as chronic upper thoracic back pain and pain where the spinal cord stimulator had been implanted. Dr. Lopez noted that he did not believe the plaintiff's chest tightness was from a cardiac source and that the plaintiff "has a very extensive anxiety disorder" (Tr. 1042-45).

The plaintiff returned to Pain Management Associates on April 2, 2012. He reported pain from his shoulders to his feet, as well as tingling and numbness in his legs. He also felt his medication was not as effective as it used to be (Tr.1274-76).

On May 31, 2012, the plaintiff returned to Pain Management Associates with complaints of pain, tingling, and numbness. Discussion with Carlee Groomes, PA-C, centered on his ongoing lumbar pain, lower extremity pain, and pain from the spinal cord stimulator battery, as well as the fact that his pain medication was not effective (Tr. 1270-73).

On August 7, 2012, the plaintiff reported continued palpitations to Dr. Littlefield. He also reported bursitis in both shoulder joints, which were "very tender." He reported having a lot of pain, particularly at night, and problems getting rest. Steroid injections were performed on the bilateral shoulders (Tr. 1125-26). On August 9, 2012, he returned to Dr. Littlefield complaining of sharp shooting pain across the chest that was not associated with exercise or activity (Tr. 1123-24). He continued to complain of neck pain, back pain, and bilateral leg pain when he returned to Pain Management Associates for a followup visit on August 29, 2012 (Tr. 1266). On September 10, 2012, the plaintiff returned

20

to Dr. Littlefield and reported tingling and burning in both upper and lower extremities. He was diagnosed with neuropathy (Tr. 1121-22).

On September 25, 2012, the plaintiff had a followup with Ms. Groomes. He reported that his right-sided low back pain was worse, and when he turned up the spinal cord stimulator, the pain was "unbearable." Examination revealed positive bilateral straight leg raise testing on the right at 70 degrees. Exaggerated lumbar flexion was painful, and there was tenderness to palpation over the bilateral and middle lumbar paraspinals. Posture was altered due to forward flexed body posture (Tr. 1262-65). The plaintiff saw Ms. Groomes again for followup on November 27, 2012, and reported that he continued to have low back pain with radiation to the legs, along with trouble sleeping. He stated his medication regimen was not helping with his pain (Tr. 1258). During a visit on December 21, 2012, it was noted that the plaintiff had altered posture due to flexed body posture (Tr. 1254-56). He returned on February 26, 2013, and reported that he continued to have pain in his midback to his feet with tingling in his legs. He again expressed his feeling that his medications were not effective. Posture was again noted as altered due to forward flexed body position (Tr. 1250-53). The plaintiff was next seen at Pain Management Associates on March 26, 2013. He was not sleeping well, and his medications were not working. Posture continued to be altered, and a lumbar CT was recommended (Tr. 1245-49). The lumbar CT was performed on April 19, 2013. Subtle disc space narrowing was noted at L1-2 through L3-4, and there was minor bulging annuli at the L3-4 and L4-5 level causing minimal impression upon the anterior thecal sac and bilateral neural foraminal encroachment. There was also bilateral facet arthropathy at L4-5 (Tr. 1240).

On May 3, 2013, the plaintiff returned to Dr. Littlefield with chest pain associated with exercise and activity, which seemed to be more frequent. He also reported that his chest pain was associated with stress and anxiety, but it would sometimes go away with sitting down, resting, and relaxing. Dr. Littlefield reassured him that his chest pain was

not cardiac (Tr. 1119-20).  He returned to Pain Management Associates for a followup on May 9, 2013.  His posture was still altered due to forward flexed body posture.  He continued to complain of neck pain, back pain, and bilateral leg pain, and he reported that he was having difficulty performing activities of daily living (Tr. 1236-39).  On May 14, 2013, the plaintiff presented to the Spartanburg Regional Emergency Room with chest pain (Tr. 1003-14).  On May 16, 2013, he had a myocardial perfusion study.  It did not show ischemia but did show a decreased ejection fraction of 39% of the left ventricle (Tr. 1040).

On June 10, 2013, the plaintiff returned to Pain Management Associates complaining of neck pain, back pain, and bilateral leg pain.  He felt that his spinal cord stimulator was not working at all.  He still had difficulty performing activities of daily living. (Tr. 1232-35).  On July 8, 2013, he saw Dr. Blackwell.  He reported low back pain that radiated down the bilateral lower extremities.  He wanted the spinal cord stimulator removed.  Examination notes showed reflexes to be 1+ at the patellar and Achilles bilaterally (Tr. 1228-30).

On July 30, 2013, the plaintiff had the spinal cord stimulator removed because he felt it was no longer providing coverage and was actually causing more discomfort (Tr. 1158-59).

On September 5, 2013, the plaintiff followed up with Pain Management Associates.  He continued to display 1+ reflexes of the patellar and Achilles bilaterally.  He also reported having anxiety, sleep problems, and depression (Tr. 1224-27).  On October 22, 2013, he reported to Dr. Littlefield that he was experiencing daytime fatigue and sleepiness and "just never feels good."  He reported sometimes having to pull to the side of the road to sleep due to fatigue.  He also continued to have sharp shooting pain in his chest (Tr. 1110).

On January 6, 2014, the plaintiff returned to Pain Management Associates and reported his medications were not working all the time.  His sleep pattern was fair (Tr.

1215).  At a followup visit on February 3, 2014, he complained of pain in the lower back down to both feet and radiating up the spine and up the left arm (Tr. 1212).  On February 10, 2014, he had another MRI of the lumbar spine, which showed some spondylosis (Tr. 1001-02).  On March 4, 2014, he saw Christopher Rubel, M.D., of Pain Management Associates.  He reported pain in the left arm, bilateral back, and bilateral legs, and examination notes showed joint swelling and warmth and tenderness to palpation of the spinous process of the lumbar spine.  Range of motion elicited pain with extension, flexion, and lateral bending.  Straight leg raise test was positive, Yeoman's test was positive, sacroiliac ("SI") compression test was positive, and facet loading was positive.  The plaintiff had tenderness of the iliac crest, the sciatic notch, and the SI joint (Tr. 1209-11).

On April 14, 2014, the plaintiff saw Dr. Littlefield.  He continued to report chest pain in the substernal area associated with exercise and activity and palpitations (Tr. 1100–04).  On April 21, 2014, he returned to see Dr. Rubel.  On examination, he had swelling and tenderness in the lumbar region; painful range of motion with extension, flexion, and lateral bending; and positive straight leg raise and SI compression tests (Tr. 1203-06). On May 19, 2014, Dr. Rubel's examination of the plaintiff showed joint erythema and warmth of the lumbar region; tenderness to palpation of the spinous process; pain on extension, flexion, and lateral bending.  He also had a positive straight leg raise test, positive SI compression test, and pain with hip internal rotation on left and right. Tenderness also was noted of the iliac crest and the sciatic notch of the bilateral hips and the bilateral piriformis.  Reflexes were 1+ for the bilateral patellar reflexes, and strength of 3/5 was noted throughout the bilateral lower extremities (Tr. 1198-1202).

On June 27, 2014, the plaintiff saw Sanjitpal Gill, M.D., of the Medical Group of the Carolinas – Orthopedic Surgery, for neck pain, right arm pain, lower back pain, and bilateral leg pain.  On examination, it was noted that he had tenderness to palpation of the neck and back with limited range of motion.  He had some subtle hand intrinsic weakness

23

and subtle EHL weakness, as well as anterior thigh and anterior shin numbness. New MRIs of the cervical and lumbar spine were recommended (Tr. 998-1000). When the plaintiff saw Dr. Littlefield on July 9, 2014, he reported experiencing episodes of dizziness, lightheadedness, and faintness, which seemed to be sometimes related to vertigo with pre-syncopal type symptomatology (Tr. 1095). The plaintiff had an EMG on July 22, 2014, which revealed moderate L5 and S1 radiculopathy on the right and left (Tr. 994). On July 29, 2014, he then had a lumbar MRI that showed slight progression of degenerative disc changes and mild disc bulge with shallow foraminal protrusion at L3-L4 (Tr. 992).

On August 4, 2014, the plaintiff saw Dr. Rubel and stated that his pain was worsening, particularly in the hips and legs. His ambulation was limited (Tr. 1192-94). He followed up with Dr. Gill on August 18, 2014. He complained of back pain radiating to his legs. He had some stenosis at L4/5 and also some degeneration, as well as subtle degeneration at L3/4. Examination showed slight reduction in EHL strength bilaterally and the plaintiff complained of neck pain during the examination. A CT of the lumbar spine was ordered (Tr. 989-91). The CT was performed on August 25, 2014. It showed mild degenerative changes at multiple levels and a bulging disc at L3-L4 and L4-L5 (Tr. 987). The plaintiff also had bilateral L4-L5 facet injections on September 4, 2014 (Tr. 985).

On September 25, 2014, the plaintiff returned to Dr. Littlefield. He had complaints of palpitations and back pain. It was noted that his back pain was significant and needed to be evaluated (Tr. 1090-94). The plaintiff followed up with Dr. Gill on September 26, 2014. He reported that he had a reaction to the steroid injection and that it did not help his pain (Tr. 983-84). On October 3, 2014, he returned to Dr. Rubel. The severity of his pain was worsening, and examination noted edema in the musculoskeletal review (Tr. 1182-86). He saw Dr. Rubel again on November 3, 2014, for neck pain, thoracic and lumbosacral neuritis, and lumbosacral spondylosis (Tr. 1151-56). He returned to Dr. Rubel for another followup on December 1, 2014, for hip pain, low back pain, and neck pain (Tr. 1146-50).

24

At the April 7, 2015, hearing following remand, the plaintiff testified as to his current symptoms. At the hearing, he was wearing a back brace, which he testified that he had worn since 2010 "pretty often" for stability and pain reduction. The plaintiff testified that wearing his back brace reduced his pain from a 10/10 to a 5/10. While wearing it, he was able to walk around and exercise. He stated that he continued to be able to drive a car. He testified that he could sometimes sit on the couch for 30 minutes, sometimes 15 minutes, and then would have to change positions (Tr. 698, 700, 703, 705. 710).

During the April 2015 hearing, the ALJ asked the testifying vocational expert whether someone with the plaintiff's age, education, work experience, and residual functional capacity ("RFC") could perform any of his past relevant work (Tr. 719-22). The vocational expert testified that such a person could not perform the plaintiff's past relevant work, but that such a person could perform other jobs available in significant numbers in the national economy, including as a machine operator and tender, production inspector, and cashier (Tr. 722-23).

On May 12, 2015, Dr. Littlefield issued an attending physician statement. He wrote that the plaintiff experienced chronic lumbar back pain, that he had a reduced range of motion in both legs, muscle spasm and weakness, impaired sleep, reflex changes, and tenderness, but a normal gait, no sensory loss, no crepitus, no swelling, no muscle atrophy, and no weight change or change in appetite. Dr. Littlefield opined that the plaintiff could sit for zero minutes and stand for up to five minutes at a time during a workday. He further stated that the plaintiff could lift no weight ever, perform no postural movements ever, and could virtually never use his arms, hands, or fingers. He stated that the plaintiff experienced these extreme limitations since 2009. In the area of the form where Dr. Littlefield was asked to state the objective findings, such as lab results, x-rays, etc., that supported his opinion, he wrote that the plaintiff had been in three motor vehicle collisions, which resulted in inoperable lumbar back injuries and a cervical neck injury requiring surgery. He explained

25

that the plaintiff experienced 9/10 pain and had a heart stent that limited his ability to work (Tr. 1304-06).

On May 21, 2015, the plaintiff underwent a consultative exam performed by Caleb Loring, Psy.D. Dr. Loring opined that the plaintiff "is not really experiencing any psychological limits regarding his ability to accomplish activities of daily living." Dr. Loring found that the plaintiff's main problems were physical, not psychological. The plaintiff was pleasant and cooperative without any significant social problems. Dr. Loring noted that the plaintiff related that he has become frustrated, anxious, and depressed due to his physical impairments, and therefore, he would probably do better working at a job with limited public contact. Dr. Loring opined that the plaintiff's self-reported pain levels could interfere with his pace and persistence at completing tasks. However, Dr. Loring restated that the plaintiff had no demonstrable social limitations, and his mental status appeared to be fairly intact (Tr. 1311-18).

On May 30, 2015, the plaintiff underwent a consultative exam performed by John Tomarchio, M.D. Dr. Tomarchio found that the plaintiff could frequently lift/carry up to ten pounds and occasionally lift/carry up to 20 pounds. He could sit for 30 minutes at a time and stand and walk for up to 15 minutes at a time. Dr. Tomarchio opined that the plaintiff could only sit for two hours total in an eight-hour workday and stand and walk for one hour in an eight-hour workday. He found that the plaintiff could frequently or continuously reach overhead, handle, finger, feel, and push/pull with each arm, and continuously use both feet for operating foot controls. The plaintiff could never climb ladders or scaffolds, crouch, or crawl, but could occasionally climb stairs, stoop, and kneel, and frequently balance. Dr. Tomarchio recommended that the plaintiff not be exposed to unprotected hazards such as unprotected heights and moving mechanical parts, and he could occasionally be around vibrations, frequently operate a motor vehicle and be around

26

humidity/wetness, and continuously be exposed to extreme temperatures and pulmonary irritants (Tr. 1319-30).

At the November 6, 2015, hearing, Arthur Brovender, M.D., (a retired orthopedic doctor) testified as a medical expert without objection. Dr. Brovender had reviewed the plaintiff's file and provided a lengthy summary of the plaintiff's treatment and diagnoses. Based on that record, Dr. Brovender determined that the plaintiff did not meet the medical criteria for a listing level impairment. Dr. Brovender further testified that, as late as 2015 and 2016, he did not see evidence indicating that the plaintiff had limitations in his sitting, standing, and walking. He opined that the plaintiff could occasionally bend, stoop, squat, and kneel, but he should not climb ropes/ladders/scaffolds or be around unprotected heights. He had no limitations in reaching overhead or with fine or gross motor manipulation. He could lift ten pounds frequently and 20 pounds occasionally, as well as climb stairs occasionally (Tr. 661-70).

Henry Maimon, M.D., also testified as a medical expert at the November 2015 hearing in his capacity as an internal medicine specialist and gastroenterologist. The ALJ noted that the purpose for Dr. Maimon's testimony was to discuss the plaintiff's pain and its effects. Dr. Maimon provided an extensive summary of the plaintiff's treatment, focusing on his pain management. Dr. Maimon opined that the plaintiff did not meet any physical listings (Tr. 674-75, 677-79).

## IV. ANALYSIS

The relevant time period for consideration in this case is from the plaintiff's alleged disability onset date (October 23, 2009) through his date last insured (December 31, 2013). In a lengthy decision, the ALJ determined that the plaintiff had the RFC to perform a reduced range of light work (Tr. 611-44). The plaintiff argues that the ALJ erred by (1) failing to properly evaluate his subjective complaints; (2) failing to consider the vocational consequences of his pain; (3) rejecting the opinions of his treating physicians; (4) ignoring

the opinions of the consultative examiners; (5) over-assessing his RFC; and (6) limiting his

attorney's ability to cross-examine the medical consultant  (doc. 16).

### A. Subjective Complaints

The plaintiff first argues that the ALJ failed to properly evaluate his subjective

complaints (doc. 16 at 23-26).  Similarly, the plaintiff argues that the ALJ failed to consider

the vocational consequences of his pain (*id.* at 28-30). The Fourth Circuit Court of Appeals

has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or
> other symptoms is a two-step process.  First, there must be
> objective medical evidence showing the existence of a medical
> impairment(s) which results from anatomical, physiological, or
> psychological abnormalities and *which could reasonably be
> expected to produce the pain or other symptoms alleged. . . .*
>
> ***
>
> It is only *after* a claimant has met her threshold obligation of
> showing by objective medical evidence a medical impairment
> reasonably likely to cause the pain claimed, that the intensity
> and persistence of the claimant's pain, and the extent to which
> it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks

omitted) (emphasis in original).  In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals

panel held, "Having met his threshold obligation of showing by objective medical evidence

a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely

exclusively on subjective evidence to prove the second part of the test, i.e., that his pain

[was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day."

453 F.3d 559, 565 (4th Cir. 2006).  However, the court in *Hines* also acknowledged that

"'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the

functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or

sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564

(quoting SSR 90-1p, 1990 WL 300812).  The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on" in evaluating the claimant's subjective symptoms. *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). In making these determinations, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL

374186, at *4.[2] The factors to be considered by an ALJ in evaluating the intensity, persistence, and limiting effects of an individual's symptoms include the following:

> (1) the individual's daily activities;
>
> (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3) factors that precipitate and aggravate the symptoms;
>
> (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c).

In the RFC assessment, the ALJ outlined the evidence of record, including the plaintiff's testimony and medical opinion evidence (Tr. 620-42). The ALJ concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the plaintiff's statements concerning the intensity, persistence,

---

[2] Social Security Ruling ("SSR") 96-7p has been superseded by SSR 16-3p, 2017 WL 5180304 (applicable on Mar. 28, 2016). Because this application was adjudicated prior to the date SSR 16-3p became applicable, the court analyzes the plaintiff's allegations under SSR 96-7p. *See Best v. Berryhill*, C.A. No. 0:15-cv-02990-DCN, 2017 WL 835350, at *4 n.3 (Mar. 3, 2017) (applying SSR 96-7p under the same circumstances). Regardless, the court observes that SSR 16-3p discontinues use of the term "credibility," but "the methodology required by both SSR 16-3p and SSR 96-7, are quite similar. Under either, the ALJ is required to consider [the claimant's] report of his own symptoms against the backdrop of the entire case record." *Id.* (alteration in original) (quoting *Sullivan v. Colvin*, C.A. No. 7:15-cv-504, 2017 WL 473925, at *3 (W.D. Va. Feb. 3, 2017)). *See also Keaton v. Colvin*, C.A. No. 3:15-cv-588, 2017 WL 875477, at *6 (E.D. Va. Mar. 3, 2017) ("Effective as of March 28, 2016, SSR 16-3p superseded SSR 96-7p. SSR 16-3p effectively removes the use of the term 'credibility' but does not alter the substantive analysis.").

and limiting effects of those symptoms were not entirely credible (Tr. 632). Specifically, the ALJ noted that, in April 2015, the plaintiff testified that he could sit on the couch for 15 or 30 minutes and then had to change positions (Tr. 631; *see* Tr. 710). The ALJ further noted the plaintiff's testimony that Dr. Littlefield told him to walk, and whether the plaintiff walked depended on if he was taking medication. If he took medication and wore the back brace, he could walk "a good hour" before pain built up, and then he had to sit down (Tr. 631; *see* Tr. 705, 707). The ALJ further noted that the plaintiff testified that he had to shift positions because of his pain, and he spent two hours at a time lying flat on his back. If he was moving around, his pain could be at a ten, but his brace reduced it to a five (Tr. 631; *see* Tr. 703, 712).

The ALJ found that the plaintiff's claims as to his sitting, standing, and walking restrictions were partially credible, and he considered them in formulating the RFC, which included a sit/stand option (Tr. 631). In finding the plaintiff's testimony partially credible, the ALJ noted that there were minimally positive findings in the plaintiff's lower extremities during the relevant period, examinations had shown normal or only mildly antalgic gait and station, he had no lower extremity edema, and had normal motor strength, sensation, and reflexes (Tr. 621). Additionally, the ALJ explained that the plaintiff has not required an assistive device to walk, and the consultative examiners confirmed that finding (Tr. 621).

In evaluating the plaintiff's subjective complaints, the ALJ also considered the plaintiff's activities of daily living and determined that the plaintiff was not as limited as he claimed. For example, the ALJ noted that the plaintiff told Dr. Tomarchio that he could dress himself and drive a car; he swept, shopped, and could climb stairs; he could walk while wearing his back brace; he went out with his wife and picked up his daughter; he went shopping; and he went out by himself and to most doctors' appointments alone. The plaintiff went to his daughter's school and to her dance classes, and he went to the grocery store. He visited with friends and relatives, and he stated that he could not go to church recently

31

because he could not sit through the service.  The ALJ noted that, despite making these statements to Dr. Tomarchio, two months later he testified that his only household chore was to fold towels (Tr. 630). The ALJ further noted that, based on the examination findings and the plaintiff's statements during the examination, Dr. Tomarchio found that the plaintiff could perform tasks including shopping, traveling alone, ambulating without assistance, walking a block at a reasonable pace, using public transportation, climbing a few steps at a reasonable pace with the use of a single hand rail, preparing food, caring for his personal hygiene, and sorting, handling, or using paper/files (Tr. 630; *see* Tr. 1330).

The plaintiff argues that his ability to do some household and daily activities, including being able to occasionally drive or prepare a meal, does not mean that he can perform the demands of work at a job for eight hours a day, five days a week (doc. 16 at 26).  The undersigned agrees.  However, daily activities are an appropriate consideration in the evaluation of the intensity, persistence, and limiting effects of a claimant's symptoms, and this was but one factor considered by the ALJ in the assessment of the plaintiff's subjective complaints.  *See* 20 C.F.R. § 404.1529(c) (listing factors relevant to a claimant's symptoms that will be considered by the Administration, including "daily activities"). The plaintiff also argues that the ALJ failed to consider that he testified that he was only able to perform daily activities for short periods of time or infrequently (doc. 16 at 26) (citing Tr. 85-91). However, the ALJ specifically considered the plaintiff's testimony and contrasted it with the plaintiff's statements to Dr. Tomarchio two months later (Tr. 630).

Despite the plaintiff's arguments to the contrary (doc. 16 at 29), the ALJ also stated that he considered the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms in assessing his subjective complaints. The ALJ explained that the plaintiff told Dr. Tomarchio he could stand for 15 minutes, walk for 30 minutes, sit for 15 minutes at a time, and only lift two pounds. In recent testimony, however, the plaintiff admitted that Dr. Littlefield told him to walk, and the plaintiff testified that if he took his

32

medications and wore his brace, he could walk for approximately an hour.  The ALJ further noted that the plaintiff testified that he could sit for up to 30 minutes before changing positions.  The plaintiff testified that he had to lie on his back for two to three hours to relieve his pain, but in other portions of testimony, he said that lying on his back was his worst position (Tr. 631; *see* Tr. 712).

The ALJ also expressly considered the type, dosage, effectiveness, and side effects of the plaintiff's medications, treatment he received for pain relief and other symptoms, and other measures he used to treat his symptoms (Tr. 631). The ALJ acknowledged the nausea the plaintiff complained of as a side effect of his medications, the headaches associated with his pain, and his abilities while medicated (Tr. 631-32).  The ALJ noted that these side effects were accommodated by a change in the type or dose of medication (Tr. 632). The ALJ also stated that the plaintiff wore a back brace but did not use any other assistive device, such as a cane. The ALJ also noted that the plaintiff sometimes failed to follow medication instructions by taking too much or too little medication, which resulted in his pain management doctor dismissing him from care. The ALJ further discussed that pain treatments have been effective in reducing the plaintiff's pain based on the plaintiff's frequent self-reports of pain reduction (Tr. 632; *see* Tr. 1175).

The ALJ also discussed several other factors that he considered assessing the plaintiff's subjective complaints.  Specifically, through the date last insured (December 31, 2013), the plaintiff received only conservative treatment for his impairments.  No treating or examining source recommended surgery or inpatient treatment until 2015.  Further, all treatment sources who evaluated the plaintiff's back opined that he did not need lumbar surgery, including Dr. McCorkle, who made no findings to warrant surgical intervention. Further, in 2014, Dr. Mitchell also said that he found no reason for the plaintiff's continued back and leg pain.  As for the plaintiff's mental impairments, the ALJ noted that, although the plaintiff was referred for mental health treatment on several occasions including by Dr.

33

Behr, there was little evidence that he sought or received treatment from a mental health professional through the date last insured.  He told Dr. Loring that he went to ProCare Counseling, but the ALJ found no records from that facility.  The ALJ further noted that the fact that the plaintiff remained stable on medications prescribed by his medical providers indicated that his mental impairments were not so severe as to be disabling (Tr. 632; *see* Tr. 220-23, 1172, 1312).

The plaintiff argues that, pursuant to SSR 96-7p, the ALJ erred in failing to consider his persistent treatment attempts as bolstering his credibility (doc. 16 at 25). However, as argued by the Commissioner, while the ruling states that "[p]ersistent attempts by the individual to obtain relief of pain . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms," the ruling also states that a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." *See* SSR 96-7p, 1996 WL 374186, at *7.

The ALJ specifically discussed the plaintiff's complaints of pain and, as discussed above, gave several reasons that are supported by substantial evidence for concluding that the plaintiff's pain was not so limiting as to prevent him from performing the modest exertional demands of light work with additional mental, exertional, postural, manipulative, and environmental limitations (Tr. 630-32). Here, the ALJ specifically considered the plaintiff's treatment level and frequency, including that the treatment was inconsistent with the level of pain he claimed and that he had not followed medication instructions, which resulted in his discharge from treatment by one pain management physician (Tr. 631-32). "[I]t is well settled that a claimant need not be pain-free or experiencing no discomfort in order to be found not disabled." *Andreolli v. Comm'r of Soc.*

*Sec.*, C.A. No. 07-1632, 2008 WL 5210682, at *4 (W.D. Pa. Dec. 11, 2008) (citing *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 1986)).  The ALJ performed a thorough analysis, taking into account the plaintiff's various treatment regimens, his pain and pain relief efforts, as well as the inconsistencies between the plaintiff's statements/actions and the objective medical record. Based on all of these factors, as well as the evidence discussed throughout the opinion, the ALJ determined that the plaintiff's subjective claims of disabling symptoms and pain were not entirely credible (Tr. 632). The fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) . . . requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock,* 483 F.2d at 775 (citation omitted).  The court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589 (citation omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) (citation omitted).  Based upon the foregoing, the ALJ's analysis of the plaintiff's subjective complaints is supported by substantial evidence and without legal error.

### *B. Medical Opinions*

The plaintiff next argues that the ALJ erred in rejecting the opinions of his treating physicians (doc. 16 at 30-34).  The regulations require that all medical opinions in a case be considered. 20 C.F.R. § 404.1527(b).  The regulations further direct ALJs to accord controlling weight to a treating physician's opinion that is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that is not inconsistent with the other substantial evidence of record. *Id.* § 404.1527(c)(2).  If a treating physician's opinion is not given controlling weight, the ALJ must proceed to weigh the

treating physician's opinion, along with all the other medical opinions of record, based upon the following non-exclusive list of factors: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5).[3] *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

### 1. Dr. Kooistra

The plaintiff argues that the ALJ failed to properly consider the opinions of his treating neurologist, Dr. Kooistra (doc. 16 at 31-32). In May 2010, Dr. Kooistra opined that, in an eight-hour day, the plaintiff could stand for one hour, sit for two hours, and walk between zero and one hour, and further stated that the plaintiff was totally disabled from his and any other occupation at that time (Tr. 374–75). On April 25, 2011, Dr. Kooistra reported that the plaintiff was unable to perform even sedentary work; he had shown little or no response to conservative treatment; she doubted that he would return to work; and he currently was unable to work in his occupation or in any other occupation (Tr. 463–64). On November 16, 2011, Dr. Kooistra again expressed her opinion that the plaintiff was not capable of full-time work even at a sedentary level; his low back pain was constant, severe, and worsened with activity; positive objective signs include reduced range of motion, muscle spasm, and impaired sleep; the plaintiff could sit for one hour at a time and stand for 30 minutes a time but could stand/walk for less than two hours in an eight-hour day and sit about four hours in an eight-hour day; the plaintiff could only rarely lift up to 20 pounds and

---

[3] These regulations apply for claims, like the plaintiff's, filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. For claims filed on or after March 27, 2017, a new regulatory framework for considering and articulating the value of medical opinions has been established. *See id.* § 404.1520c. *See also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (revisions to medical evidence rules dated Jan. 18, 2017, and effective Mar. 27, 2017).

could rarely twist, stoop, or climb stairs, and could never crouch/squat or climb ladders; and the plaintiff's restrictions have been present since October 2009 (Tr. 578–80). In December 2011, Dr. Kooistra stated that the plaintiff could sit for one hour at a time, stand for 30 minutes at a time, and walk for 45 minutes at a time, sit for about two hours total in an eight-hour day, and stand/walk for less than two hours in an eight-hour day.  She stated that her opinion was based on history, exam, and diagnostic studies, and that cardiac functional capacity did not contribute to this functional capacity (Tr. 597–98).

In the RFC assessment, the ALJ set out the medical evidence, including the opinions of Dr. Kooistra (Tr. 622-32).  Then, in his assessment of the opinion evidence,  the ALJ dedicated over two full pages to discussing Dr. Kooistra's opinions (Tr. 632-34).  As noted by the Commissioner, the court's prior remand in this case was largely because the ALJ had previously not performed a fully developed analysis of Dr. Kooistra's opinions (Tr. 804-808, 821-27). The undersigned agrees with the Commissioner that the ALJ has now provided an extensive, well-supported evaluation of the opinions (Tr. 632-34).

First, the ALJ noted that Dr. Kooistra's various statements that the plaintiff could not work were not entitled to deference because they are administrative findings reserved to the Commissioner (Tr. 632-33).  *See* 20 C.F.R. § 404.1527(d) (an opinion that a claimant is disabled is not a medical opinion but is instead an administrative finding on an issue reserved to the Commissioner). The ALJ went on to discuss the legal framework for his evaluation of Dr. Kooistra's opinions and found that certain portions of Dr. Kooistra's opinions were entitled to controlling weight (Tr. 633-34). Specifically, the ALJ found that Dr. Kooistra's opinion that the plaintiff could use both hands for repetitive movements and could reach above shoulder level with both arms was entitled to controlling weight because the evidence showed no limitations in these areas.  The ALJ also gave controlling weight to Dr. Kooistra's opinion that the plaintiff had no work-related limitation from coronary artery disease as the evidence showed no such limitation (Tr. 634).

The ALJ noted that in her April 2011 opinion, Dr. Kooistra stated that disability was based on "subjective findings only" (Tr. 633; *see* Tr. 463-64). The ALJ further found that Dr. Kooistra's RFC findings were not entitled to controlling weight because they were not well-supported by the medical evidence, including her own treatment notes (Tr. 633-34). Accordingly, the ALJ went on to apply the factors for evaluation of non-controlling treating source opinions consistent with the regulations, finding that Dr. Kooistra's opinions as to the plaintiff's sitting, standing, and walking limitations were entitled to little weight (Tr. 633-34). *See* 20 C.F.R. § 404.1527(c). The ALJ discussed numerous reasons that Dr. Kooistra's opinions were unsupported by the record evidence (Tr. 633-34). For example, Dr. Kooistra's clinical findings, other than EMG findings, were almost all negative (Tr. 633). As of May 2009, Dr. Kooistra noted that the plaintiff appeared neurologically intact (Tr. 308). The ALJ explained that, in 2009, Dr. Kooistra made findings that could not be corroborated with MRI evidence (Tr. 634). In the June 2009 through November 2011 examinations, Dr. Kooistra noted that the plaintiff had negative straight leg raise tests, and he had normal fine motor movements, foot-tapping, gait, tone, bulk, strength, and reflexes (Tr. 634; *see* Tr. 298-99, 377, 379, 382, 460). Dr. Kooistra ordered a lumbar myelogram and CT scan in August 2009, which did not show any significant changes from prior studies (Tr. 292-93, 297).The ALJ further noted that the plaintiff's pain was 5/10 in January 2010, 6/10 in April 2010, 0/10 in August 2010, 3/10 in March and August 2011, with pain reduced by half in August 2011 with the use of a spinal cord stimulator (Tr. 634).

The ALJ also noted that Dr. Kooistra's findings were inconsistent with those of the plaintiff's primary care physician, Dr. Bailes (Tr. 633). In August 2011, Dr. Bailes "strongly discourage[d] [the plaintiff] from allowing himself to go on disability or to resort to strong narcotics" (Tr. 557). In October and November 2011, Dr. Bailes stated that the plaintiff's "[anxiety] problem is presently controlled" (Tr. 555, 596).

38

Lastly, the ALJ noted that, at the December 2011 administrative hearing, the plaintiff testified that Dr. Kooistra was not treating him, but rather was "monitoring" him (Tr. 633; *see* Tr. 90). The ALJ also noted that there were issues as to Dr. Kooistra's status as a treating physician since, on a number of visits, Dr. Kooistra noted that the plaintiff came in for her to complete forms for insurance or disability, and, after the last visit in December 2011, Dr. Kooistra stated that she would follow up with the plaintiff in three to four months if she was still considered his treating physician, but she would see the plaintiff in four to six months if the only purpose for the visit was to complete forms (Tr. 634; *see* Tr. 1132).

Based upon the foregoing, the ALJ thoroughly explained his reasons for finding that Dr. Kooistra's opinions were not entitled to greater weight. Substantial evidence supports that finding.

### 2. Dr. Littlefield

The plaintiff further argues that the ALJ should have given greater weight to the opinion of treating physician Dr. Littlefield (doc. 16 at 32). On May 12, 2015, Dr. Littlefield, noted that the plaintiff "has had 3 [motor vehicle accidents] that caused lumbar back damage that is inoperable – limits mobility with pain scale of 9 out of 10 in both lower extremities." Dr. Littlefield also noted that the plaintiff showed positive objective signs of reflex changes, tenderness, muscle spasm, muscle weakness, and impaired sleep, and opined that the plaintiff was unable to sit more than zero minutes and stand more than five minutes at a time. He further opined that the plaintiff could never lift and carry any amount of weight; never perform any postural activities; could use his right hand for 5% of an eight-hour workday to grasp, turn, or twist objects; could use his arms for reaching for 0% of an eight-hour workday; and could use his fingers for fine manipulations for 0% of an eight-hour workday (Tr. 1304–06).

In his assessment of the opinion evidence, the ALJ dedicated two full pages to discussing Dr. Littlefield's opinion and the weight given to it (Tr. 635-36). The ALJ

adopted Dr. Littlefield's opinion that the plaintiff should never climb ladders and never crawl, stating that these findings were well-supported by the record (Tr. 635). The ALJ gave little weight to Dr. Littlefield's opinion on postural limitations other than climbing ladders and crawling, finding that Dr. Littlefield's own office notes did not support such severe limitations for these postural activities (Tr. 636).  The ALJ also gave little weight to Dr. Littlefield's opinion as to the plaintiff's sitting, standing, walking, lifting, and carrying limitations, finding that, through December 31, 2013, the plaintiff had some degree of limitation as to these activities but not to the severe extent Dr. Littlefield described (Tr. 636).  The ALJ also gave little weight to Dr. Littlefield's opinion as to the plaintiff limitations for fine and gross manipulation and reaching because the evidence showed he had no limitations for fine and gross manipulation, and the degree of limitation for reaching overhead was inconsistent with Dr. Littlefield's own treatment notes and other record evidence. Further, the plaintiff had not alleged having limitations affecting the use of his hands (Tr. 636).

In giving these portions of Dr. Littlefield's opinion little weight, the ALJ noted that, when analyzing the length and frequency of contacts between Dr. Littlefield and the plaintiff, Dr. Littlefield said that he saw the plaintiff every two to three months, but his office notes indicated visits were less frequent at times, including no visits between September 2012 and May 2013 and no visits between November 2013 and April 2014. The ALJ also noted that there was documentation of treatment after accidents in 2009 and 2011, but little documentation of a third accident. The ALJ also noted that Dr. Littlefield's statement that the plaintiff experienced 9/10 pain was inconsistent with the plaintiff's admission that his pain went down to a 4/10 with medication. The ALJ noted that Dr. Littlefield claimed the extreme limitations he assigned were due to the plaintiff's reduced range of motion in both legs, muscle spasm and weakness, impaired sleep, reflex changes, and tenderness (Tr. 635). However, Dr. Littlefield also stated that the plaintiff had a normal gait, no sensory loss, no crepitus, no swelling, no muscle atrophy, and no weight change or change in appetite

40

(Tr. 1304). The ALJ noted that, contrary to his list of positive findings, Dr. Littlefield's treatment notes from February and July 2012 showed that the plaintiff had a normal range of motion in his lower extremities, no leg or foot pain, no back pain, normal neurologic testing, and the plaintiff denied trouble walking (Tr. 636; *see* Tr. 1127-30). Dr. Littlefield made similar findings in August 2012 and found no evidence of sensory or motor deficits (Tr. 636; *see* Tr. 1123-26). In May, July, October, and November 2013, the plaintiff denied having arthralgias, back pain, leg pain, and foot pain, and his examination results showed normal range of motion and normal neurological findings (Tr. 636; *see* Tr. 1105-20). In April, July, and September 2014 and January 2015, the plaintiff again denied neurologic or musculoskeletal symptoms, and examination findings revealed no deformity or scoliosis of the thoracic or lumbar spine, normal range of motion, and no neurologic deficits (Tr. 636; *see* Tr. 1072-1104). Accordingly, the ALJ determined that Dr. Littlefield opinion was unsupported by his own treatment notes (Tr. 636).

Additionally, the ALJ took into account the plaintiff's activities of daily living and other medical records that undermined Dr. Littlefield's opinion (Tr. 636). Moreover, the ALJ relied on significant portions of Drs. Loring and Tomarchio's opinions from their consultative examinations of the plaintiff (Tr. 638-39). As discussed below, the ALJ found that those opinions were largely consistent with the record evidence, and as such, he relied on them as support for the RFC determination (Tr. 638-40).

Based upon the foregoing, the ALJ thoroughly explained his reasons for finding that Dr. Littlefield's opinion was not entitled to greater weight. Substantial evidence supports that finding.

### 3. Consultative Examiners

The plaintiff argues that the ALJ erred by "ignoring" the consultative exam reports of Drs. Loring and Tomarchio and affording them little weight without proper reasoning (doc. 16 at 34-35). However, not only did the ALJ extensively discuss these

41

opinions and justify the weight he assigned to them, but he actually assigned significant weight to Dr. Loring's opinion and great weight to portions of Dr. Tomarchio's opinion (Tr. 638-40).

Psychologist Dr. Loring performed a consultative examination of the plaintiff in May 2015 and opined that the plaintiff was "not really experiencing any psychological limits regarding his ability to accomplish activities of daily living." Dr. Loring found that the plaintiff's main problems were physical, not psychological. During the examination, the plaintiff came across as pleasant and cooperative without any significant social problems. Dr. Loring noted that the plaintiff related that he had become frustrated, anxious, and depressed due to his physical impairments, and therefore, Dr. Loring opined that the plaintiff would probably do better working at a job with limited public contact. Dr. Loring further opined that the plaintiff's self-reported pain levels could interfere with his pace and persistence at completing tasks. However, Dr. Loring restated that the plaintiff had no demonstrable social limitations, and his mental status appeared to be fairly intact. Dr. Loring found mild limitation of ability to understand, remember, and carry out simple work instructions and mild limitation of ability to make judgments on simple work-related tasks, but moderate limitation of ability regarding complex work tasks and moderate limitation of ability to make judgments on complex work-related decisions.  Dr. Loring further stated that the plaintiff had no intellectual deficits and only mild limitation of ability to interact appropriately with coworkers, supervisors, and the public.  Dr. Loring assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 44 (Tr. 1311-18).[4]

---

[4] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See*  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n,

The ALJ summarized Dr. Loring's findings in the decision and discussed his reasons for giving the opinion significant weight. The ALJ stated that Dr. Loring's findings were consistent with the overall record as well as Dr. Loring's own examination of the plaintiff (Tr. 638). The ALJ further noted that Dr. Loring's findings in 2015 were consistent with Dr. Long's examination of the plaintiff in 2011, in which Dr. Long found that the plaintiff had mild cognitive impairment and good communication skills, and his anxiety and depression were treated effectively with medication (Tr. 637-38; *see* Tr. 523-25).[5]

The plaintiff argues that the ALJ did not appropriately consider Dr. Loring's finding that the plaintiff's pain could interfere with his pace and persistence at completing tasks (doc. 16 at 34-35). However, the ALJ specifically limited the plaintiff to simple, routine, repetitive work performed in an environment free of fast-paced production requirements with few, if any, changes, which is consistent with Dr. Loring's finding (Tr. 620).

Further, the plaintiff contends that the ALJ erred in rejecting the GAF score of 44 assigned by Dr. Loring (doc. 16 at 35). As noted above, the most recent edition of the *DSM* has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See DSM-V*, 16. "After the *DSM-V* was published, the Social Security Administration issued a directive to its ALJs in July 2013, instructing them to still consider GAF scores as medical opinion evidence but emphasizing that GAF scores should not be considered in isolation." *Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017). The directive stated:

---

*Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

[5] The ALJ also considered Dr. Tollison's evaluation of the plaintiff in July 2011 and fully discussed the reasons why he gave the opinion little weight (Tr. 638-39; *see* Tr. 465-68). As the plaintiff has not asserted any error in the ALJ's consideration of that opinion, it will not be discussed further.

> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.
>
> A GAF score is never dispositive of impairment severity.

*Emrich v. Colvin*, 90 F. Supp.3d 480, 492 (M.D.N.C. 2015) (quoting Soc. Sec. Admin., Admin. Message 13066 (July 22, 2013)).

Here, the ALJ specifically considered Dr. Loring's assignment of a GAF score of 44.[6] The ALJ noted that the score was a medical opinion evidence that must be considered and noted that he had considered whether other clinical findings supported the GAF score and whether it was consistent with other record evidence.  The ALJ also noted that GAF scores of 41-50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning. The ALJ found, however, that the score was entitled to little weight because it was inconsistent  with the "B criteria" findings and with Dr. Loring's own findings.  Specifically, Dr. Loring found that psychological problems were not the primary issue limiting the plaintiff's daily activities (Tr. 640; *see* Tr. 1314).  At step three of the sequential evaluation process, the ALJ found in regard to the "B criteria" findings that the plaintiff had only mild restriction in activities of daily living and social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation, relying in large part on Dr. Loring's findings (Tr. 618-19; *see* Tr. 1311-18). As the ALJ stated, these findings were inconsistent with the GAF of 44 (Tr. 640).

---

[6] The ALJ also considered Dr. Tollison's assignment of a GAF score of 50 in 2011 (Tr. 640).

44

Also in May 2015, the plaintiff underwent a consultative exam performed by Dr. Tomarchio, who found that the plaintiff could frequently lift/carry up to ten pounds and occasionally lift/carry up to 20 pounds; could sit for 30 minutes at a time and stand and walk for up to 15 minutes at a time; could sit for two hours total in an eight-hour workday and stand and walk for one hour in an eight-hour workday; could frequently or continuously reach overhead, handle, finger, feel, and push/pull with each arm, and continuously use both feet for operating foot controls could never climb ladders or scaffolds, crouch, or crawl, but could occasionally climb stairs, stoop, and kneel, and frequently balance; should not be exposed to unprotected hazards such as unprotected heights and moving mechanical parts; could occasionally be around vibrations; frequently operate a motor vehicle and be around humidity/wetness; and continuously be exposed to extreme temperatures and pulmonary irritants (Tr. 1319-30).

The ALJ adopted numerous parts of Dr. Tomarchio's findings and explained why he did not adopt all of them (Tr. 639-40). As noted by the Commissioner, in rejecting some of Dr. Tomarchio's findings, the ALJ acted in the plaintiff's favor because many of Dr. Tomarchio's findings were less restrictive than the RFC assessment. For example, the RFC assessment required that the plaintiff avoid concentrated exposure to extreme cold, excessive vibration, and exposure to various pulmonary irritants and hazards, but Dr. Tomarchio did not limit the plaintiff to that extent. Dr. Tomarchio opined that the plaintiff could lift 20 pounds occasionally, but the ALJ found that he could only lift 15 pounds occasionally. The ALJ also assigned restrictions to the plaintiff's ability to use foot controls, but Dr. Tomarchio did not. The RFC also required only occasional use of the right upper extremity to push/pull, but Dr. Tomarchio opined that the plaintiff could perform that movement frequently. The RFC assessment required only occasional overhead reaching with the right upper extremity, but Dr. Tomarchio opined the plaintiff could reach frequently (*compare* Tr. 620 *with* Tr. 1325-29).

45

The only remaining limitations at issue are the following: Dr. Tomarchio found that the plaintiff could sit for 30 minutes at one time, stand for 15 minutes at one time, walk 15 minutes at one time, stand for a total of one hour, walk for a total of one hour, sit for a total of two hours, and handle frequently with both hands (Tr. 639; *see* Tr. 1325-27). The ALJ explained that Dr. Tomarchio's handling limitation, which was not adopted into the RFC, contradicted Dr. Tomarchio's findings that the plaintiff's extremities showed no evidence of redness, swelling, or effusion; his grip strength was 5/5 bilaterally; and he had normal fine and gross manipulative skills (Tr. 640; *see* Tr. 1321). Additionally, the walking, sitting, and standing limitations found by Dr. Tomarchio were contradicted by his findings that the plaintiff's lumbar spine range of motion was normal; his knee, hip, and ankle range of motion was largely normal; straight leg raise testing was normal; and he was able to perform tandem walking and heel and toe walking (Tr. 640; *see* Tr. 1321-22, 1326). Moreover, the plaintiff had full motor strength in all extremities and grossly normal sensation (Tr. 1321). The ALJ also emphasized that Dr. Tomarchio's findings were based on the plaintiff undergoing spine surgery in April 2015, well after the date last insured of December 31, 2013 (Tr. 640; *see* Tr. 1326-27).

Based upon the foregoing, the ALJ thoroughly explained why he weighted the opinions of Drs. Loring and Tomarchio as he did, and substantial evidence supports those findings.

### 4. Dr. Brovender

The plaintiff argues that the ALJ should not have relied on Dr. Brovender's testimony as a medical expert at the November 2015 administrative hearing (doc. 19 at 27-28). Dr. Brovender testified that he spent four or more hours reviewing the plaintiff's medical records (Tr. 669-70). He concluded that the plaintiff did not meet the medical criteria for a listing level impairment (Tr. 669-70), and the plaintiff has not challenged that finding on appeal. Dr. Brovender further testified that, as late as 2015 and 2016, he did not see

evidence indicating that the plaintiff had limitations in sitting, standing, and walking (Tr. 667-68). He opined that the plaintiff could occasionally bend, stoop, squat, and kneel, but he should not climb ropes/ladders/scaffolds or be around unprotected heights. The plaintiff had no limitations in reaching overhead or with fine or gross motor manipulation, and he could lift ten pounds frequently and 20 pounds occasionally, as well as climb stairs occasionally (Tr. 668).

The ALJ gave great weight to Dr. Brovender's opinion that the plaintiff had no limitations in sitting, could lift or carry up to ten pounds frequently, had no manipulative limitations, could only occasionally work at heights, and could occasionally climb ramps/stairs and stoop. The ALJ noted that Dr. Brovender was a specialist in orthopedics, and these portions of his opinion were well supported by the objective medical evidence and were consistent with the findings of examining sources and the findings of the state agency medical consultants. However, the ALJ gave little weight to the portions of Dr. Brovender's opinion in which he stated that the plaintiff could lift or carry a maximum of 20 pounds occasionally; had no limitations for standing, walking, and reaching overhead; could occasionally climb ladders, ropes, and scaffolds; and could occasionally kneel.  The ALJ found that these findings overstated the plaintiff's RFC.  While Dr. Brovender testified that he could not find an objective basis for limitations of the right shoulder and knees, the ALJ found that the medical evidence showed severe impairment affecting those joints with resulting work-related limitations.  Accordingly, the ALJ imposed greater limitations than those opined by Dr. Brovender by limiting the plaintiff to lifting or carrying a maximum of 15 pounds occasionally; standing and walking for a maximum of two hours in a workday with a sit/stand option; limiting reaching overhead for both upper extremities; never climbing ladders, ropes, or scaffolds; and never kneeling (Tr. 641).

The plaintiff does not identify any specific issues with Dr. Brovender's testimony in this case (doc. 16 at 33-34).  Rather, the plaintiff argues that Dr. Brovender's

47

testimony is suspect because the Honorable Richard M. Gergel, United States District Judge, found fault with his testimony in a different case (doc. 16 at 33-34). Specifically, in *Alexander v. Colvin*, Judge Gergel noted that Dr. Brovender was retired and testified across the country as a witness in Social Security disability cases against claimants. C.A. No. 3:12-2631-RMG, 2014 WL 468973, at \*6 (D.S.C. Feb. 4, 2014). In reversing the decision of the Commissioner in that case, Judge Gergel found that "Dr. Brovender's testimony that there is no evidence of nerve impingement or straight leg raises is not supported by substantial evidence, and these obvious deficiencies in his testimony, as well as his status as a road worn chart reviewer, should be carefully considered in weighing the testimony of the various expert witnesses on remand." *Id.* at \*7. The plaintiff argues that "[s]imilarly, in this case, the ALJ gave only lip service to the Treating Physician Rule factors and failed to take into account the fact that Dr. Brovender is retired, no longer sees patients, and is a 'road worn chart reviewer'" (doc. 16 at 33-34).

The plaintiff's argument is unavailing as he has failed to identify any specific issues with Dr. Brovender's testimony in this case. As argued by the Commissioner, the plaintiff implies that the ALJ accepted all of Dr. Brovender's testimony uncritically, when, in fact, the ALJ only accepted those portions of testimony that he found were otherwise consistent with the record, as set out in detail above (Tr. 641). Accordingly, the plaintiff has failed to demonstrate why the ALJ's reliance on certain portions of Dr. Brovender's testimony was in error.

### 5. State Agency Nonexamining Physicians and Psychologists

In the RFC assessment, the ALJ also discussed the opinions of the nonexamining state agency physicians and psychologists and the weight he gave to their opinions (Tr. 641-42). The ALJ was required to consider the state agency medical and psychological consultants' assessments as opinion evidence as they "are highly qualified and experts in Social Security disability evaluation." *See* 20 C.F.R. § 404.1513a(b).

Moreover, the regulations require the ALJ to consider the opinions of state agency psychologists and physicians utilizing the factors outlined above and explain the weight attributed to those opinions. *Id.* § 404.1513a(b), 404.1527.

Specifically, the ALJ gave significant weight to portions of the opinions of state agency physicians Drs. El-Ibiary and Van Slooten and little weight to other portions of the opinions based upon additional evidence submitted at the hearing level showing that the plaintiff had more significant limitations for those activities (Tr. 642; *see* Tr. 364-68, 453-59) The ALJ gave little weight to the findings of state agency psychological consultants Drs. Harkness and Horn, who found that the plaintiff did not have a severe mental impairment, because additional evidence submitted at the hearing level showed that the plaintiff had severe mental impairments  (Tr. 642; *see* Tr. 349-62, 438-51).

Based upon the foregoing, the undersigned finds that the ALJ's assessment of the medical opinion evidence was based upon substantial evidence and without legal error.

### C. Residual Functional Capacity

The plaintiff further argues that the ALJ erred in over-assessing his RFC (doc. 16 at 26-28).  The regulations provide that a claimant's RFC is the most that he can still do despite his limitations. 20 C.F.R. § 404.1545(a). It is the ALJ's responsibility to make the RFC assessment, and the ALJ does so by considering all of the relevant medical and other evidence in the record. *Id.* §§ 404.1545, 404.1546(c).

Social Security Ruling 96-8p provides in pertinent part:

The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

49

SSR 96-8p, 1996 WL 374184, at *1.  The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

The plaintiff argues that because the ALJ erred in assessing his credibility, substantial evidence fails to support the ALJ's finding that he could perform a reduced range of light work.  As discussed above, however, the undersigned finds that the ALJ's assessment of the plaintiff's subjective complaints was based upon substantial evidence and without legal error.  The plaintiff further argues that it is a "clear overassessment of his RFC" for the ALJ to determine that he could perform light work (doc. 16 at 28).  However, as discussed throughout this report, the ALJ thoroughly discussed all of the record evidence and properly considered it when developing the RFC, which included very significant mental, exertional, postural, manipulative, and environmental limitations (Tr. 620-42) .  The ALJ exhaustively summarized the medical record, discussed and weighed all of the opinion evidence, and concluded that the plaintiff's claims were not entirely credible. The RFC

50

properly reflects the totality of those judgments made by the ALJ, and it is supported by substantial evidence and without legal error.

The plaintiff makes a passing argument that the ALJ "failed to consider the combined effect of [his] impairments" (doc. 16 at 27-28).  When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability.  Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

The undersigned finds no error here.  At step three of the sequential evaluation process, the ALJ found that the plaintiff had "no combination of impairments that meets or equals listing severity" (Tr. 616).  In the RFC assessment, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . " (Tr. 620). The ALJ found that "due to a combination of musculoskeletal impairments and obesity on or prior to the date last insured, the [plaintiff] could not meet the lifting or carrying requirements of very heavy, heavy, or medium exertion" and instead limited the plaintiff to lifting and carrying a maximum of 15 pounds occasionally (Tr. 621).  Further, the ALJ stated that the plaintiff's "combination of impairments does not have a negative effect upon his ability to perform light exertion with the additional limitations I have set forth" (Tr. 621). The ALJ concluded that despite the plaintiff's severe physical and mental impairments, he was capable of a reduced range of light work with additional exertional, mental, postural, manipulative, and environmental limitations (Tr. 620-42).

Review of the ALJ's decision reflects that the ALJ sufficiently considered the plaintiff's impairments in combination throughout the decision and made sufficiently particularized findings.  "'Courts in this district have found the ALJ's discussion and analysis adequate where a reading of the decision as a whole makes clear that the ALJ considered

51

the combination of impairments.'" *Grim v. Comm'r, Soc. Sec. Admin*, C.A. No. 2:15-3698-TMC-MGB, 2017 WL 639240, at *7 (D.S.C. Jan. 30, 2017) (quoting *Bell v. Colvin*, C.A. No. 4:11–cv–2114–TER, 2013 WL 1282063, at *5 (D.S.C. March 25, 2013)), *R&R adopted by* 2017 WL 633813 (D.S.C. Feb. 16, 2017).  Further, the plaintiff has not made any attempt to show how a more complete analysis would have resulted in a more restrictive RFC, and, thus, any error is harmless and does not warrant remand. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

### D. Cross-Examination of Dr. Brovender

Lastly, the plaintiff argues that the ALJ deprived him of due process at the November 2015 administrative hearing by denying his counsel "the opportunity to fully and appropriately examine the medical consultants[7] in this case" (doc. 16 at 34).  The plaintiff argues that the "hearing transcript reveals that when Plaintiff's counsel attempted to question Dr. Brovender regarding relevant factors, such as familiarity with all of the treating opinions and treating sources in the record, the ALJ stopped the examination and ordered counsel to cease the line of questioning" (doc. 16 at 34) (citing Tr. 670–71).  In the cited portion of the testimony, the following exchange took place during the plaintiff's counsel's cross-examination of Dr. Brovender:

> Q. Did you also review the . . . treating doctor opinions and consultative exams . . . ?
>
> A.  I reviewed the entire file.
>
> Q.  So you specifically reviewed the questionnaires of Dr. Kooistra, Dr. Littlefield, and Dr. Tomarchio?

---

[7] The only medical consultant at issue is Dr. Brovender.

A. That's correct.

Q. With the medical source statements?

A. Yes.

Q. All right. Do you know any of those doctors?

A. No.

Q. Do you know anything about their qualifications?

A. No.

Q. Do you have any reason to doubt that they're qualified to give opinions in a particular case?

ALJ: Ms. Craven, hold on just a minute, Doctor. Just a minute. Hold on just a moment. What has that got to do with his testimony as an expert?

ATTY: I understand. I am simply trying to establish that – that the doctors that treated him –

ALJ: No, no.

ATTY: Were [Inaudible].

ALJ: I don't want you to ask the question and, Doctor, don't answer it, okay.

ATTY: All right.

ALJ: Go ahead. I'm not going to have one expert pitted against another in terms of what is your opinion about this doctor and his or her qualifications. The person that make the determination about the weight to be given to any expert's testimony is the person you're looking at right now.

ATTY: Of course, Your Honor.

ALJ: All right, go ahead.

ALJ: Don't do that again.

ATTY: Yes, sir.

(Tr. 670-71).

"Claimants in disability cases are entitled to a full and fair hearing of their claims . . . ." *Sims v. Harris*, 631 F.2d 26, 27 (4th Cir. 1980). The ALJ plays a "crucial role in the disability review process" and has a duty to "develop a full and fair record" and to "carefully weigh the evidence, giving individualized consideration to each claim." *Miles v. Chater*, 84 F.3d 1397, 1401 (11th Cir. 1996). The United States Supreme Court has observed that "the conduct of the hearing rests generally in the examiner's discretion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971).

The record is clear that the plaintiff was afforded a full and fair hearing of his claims, and his attorney had ample opportunity to cross-examine Dr. Brovender as to his medical opinion and the basis for it.  The regulations afford an ALJ, as the fact finder, the sole duty of weighing of evidence.  The ALJ's decision to stop a line of questioning where the plaintiff's counsel sought to have one medical expert either vouch for or undermine the credibility of other medical sources was entirely appropriate, and the plaintiff has failed to provide any legal rationale for his conclusory assertion that he was denied due process. Based upon the foregoing, this allegation of error is without merit.

## V. CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

April 26, 2018
Greenville, South Carolina

54